# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **ERNEST MING,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:07cv1201 HEA/TCM** |
| | ) | |
| **DAVE DORMIRE and** | ) | |
| **CHRIS KOSTER, Attorney General for** | ) | |
| **the State of Missouri,**[1] | ) | |
| | ) | |
| **Respondents.** | ) | |

## ORDER AND REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Ernest Ming, a Missouri prisoner, petitions the United States District Court for the

Eastern District of Missouri for federal habeas corpus relief from a December 2001

conviction.[2]  See 28 U.S.C. § 2254.  Respondents filed a Response to the Order to Show

---

[1] Petitioner filed this federal habeas action to challenge a sentence of imprisonment totaling life plus ten years. (Resp't Ex. B at 67-69.) Because at the time Petitioner filed this action he was subject to future custody under the state court judgment he is now challenging, the Court will add the Attorney General for the State of Missouri, Chris Koster, as a proper party respondent. See Rule 2(b), Rules Governing Section 2254 in the United States District Courts.

Alternatively, Petitioner identified the then-Attorney General for the State of Missouri, Jeremiah W. (Jay) Nixon, in his federal habeas petition. (Pet. at 1 [Doc. 3].)  To the extent Nixon should have been identified as a Respondent from the outset of these proceedings, he is no longer the Attorney General for the State of Missouri, and the Court substitutes the present Attorney General for the State of Missouri, Chris Koster, as a proper party respondent.

[2] Along with his petition, Petitioner filed a copy of the motion court's findings of fact and conclusions of law (motion court's decision), as well as a copy of the Missouri Court of Appeals' opinion in Petitioner's direct appeal and the Missouri Court of Appeals' published order in the post-conviction appeal.  (See Docs. 3-1 and 3-2.)  These materials are not separately marked; and the Court notes that the copy of the motion court's decision filed by Petitioner is missing the page that contains the last part of paragraph 27 and the first part of paragraph 28.  The Court will refer to

Cause Why a Writ of Habeas Corpus Should Not Issue (Response). Petitioner filed a reply. This matter is before the undersigned United States Magistrate Judge for a review and a recommended disposition. See 28 U.S.C. § 636(b). Finding the claims in the federal habeas petition are untimely and lack merit, the undersigned recommends denying the petition without further proceedings.

## Background

In 2001, Ernest Ming ("Petitioner") was charged with one count of murder in the second degree in violation of Missouri Revised Statutes § 565.021; two counts of robbery in the first degree in violation of Missouri Revised Statutes § 569.020; and three counts of armed criminal action in violation of Missouri Revised Statutes § 571.015.[3] (Pet. at 1 [Doc. 3]; Resp't Ex. B at 15-18 and 20-26.) The charges arose out of the shooting death of Terry Thomas during the course of a robbery of him and two others on September 8, 2000. (See, e.g., Resp't Ex. B at 20.)

In October 2001 Petitioner was convicted of the charged offenses following a three-day jury trial. (Id. at 56-61.)

During voir dire, Juror Number 12, Bonnie Hall, expressed concern that one of the

Respondents' exhibits (see Doc. 13) when referring to these materials.

To further clarify the record, the Court notes the trial transcript filed by Respondents does not appear to contain page 205 which would be the last page of the prosecutor's opening statement. (See Resp't Ex. A, Vol. I, which ends on page 204 during the prosecutor's opening, and Vol. II, which begins at page 206 with witness testimony.)

[3] Petitioner was also charged as a prior offender. (Resp't Ex. B at 22.)

charges was a murder charge. (Resp't Ex. A at 104-05.)  At the end of voir dire, the trial court said:

> Ladies and gentlemen, I know I asked you this in the very beginning. I'm going to ask you again.  Is there anyone on the panel who, if selected as a juror in this case, could not follow the instructions of law that are given to you by the Court?

> Again, I take it by your silence that all of you could.

(Id. at 173.)  Thereafter Petitioner's counsel unsuccessfully moved to strike Juror Number 12 for cause on the grounds she would not be fair and impartial.  (Id. at 176.)

The State presented the testimony of Officer Tanisha Grant, Sergeant John Samson, Officer Richard Proffitt, Officer John Kaltenbronn, Detective Joseph Nickerson, and then-Detective Martise Scott,[4] who are or were police officers with the St. Louis County Police Department who responded to and investigated the crime scene (Officer Grant, Sergeant Samson, and Officer Proffitt), analyzed the spent bullets and shell casings related to the crime (Officer Kaltenbronn), and conducted photo lineups and further investigation (Detective Nickerson and then-Detective Scott).  (Id. at 206-20, 299-310, 351-405, 420-442, 466-501, 507-84).  The State also presented the testimony of Dr. Michael Graham, the Medical Examiner who performed the autopsy and testified that Thomas died from a gunshot

---

[4]  Then-Detective Scott was the lead homicide detective who went to the crime scene on September 8, 2000, and investigated the case until early 2001 when Detective Nickerson became the lead homicide detective on the case.  (Resp't Ex. A at 468, 484-85, 490, 509-10, 560.)  Then-Detective Scott resigned from the St. Louis County Police Department in early 2001.  (Id. at 484-85, 509, 555.)

to his chest (id. at 406-20); Hallie Thomas, Terry Thomas' mother, who identified a picture of her son, the victim of the robbery and shooting (id. at 223-24); Jackie Mayweather and Bobby Smith, two other victims of the robbery (id. at 225-99, 311-51); and Tammi Taylor, (id. at 451-63). Petitioner also testified at trial. (Id. at 590-610).

Mayweather testified that he and his cousin, Bobby Smith, were hanging out on September 8, 2000, and stopped by an apartment complex where Mayweather saw Terry Thomas, a friend of Mayweather's, on a front porch or balcony.[5] (Id. at 225-26, 229-31, 233-34.) While the three men were hanging out together on the balcony, Mayweather noticed a white car with temporary plates drive in the parking lot; the car had at least two black males inside; and shortly afterwards two men came up right behind Mayweather, Smith, and Thomas and said, "It's a robbery." (Id. at 232, 233, 235.) Mayweather saw two black males, one holding a gun in his hand, and, along with Smith, tried to jump down from the balcony. (Id. at 234, 236.) The man without the gun grabbed Mayweather as he tried to jump; Smith jumped and ran away. (Id. at 237, 238, 242.) Mayweather identified Petitioner as the man who had grabbed him; pulled him back on to the balcony; told him to "take it off"; took off Mayweather's bracelets, watch, "everything"; and went in Mayweather's pockets, before Mayweather jumped over the balcony, fell, and began running. (Id. at 239-42.) Right after Mayweather jumped the second time, he heard four or five shots. (Id. at 242.) As he was running, he passed the white car he had seen earlier, which had a man, the driver, sitting in

---

[5] Then-Detective Scott testified that the crime scene was a second floor balcony. (Resp't Ex. A at 511.)

it, and then the two other men jumped in and they drove off.  (<u>Id.</u> at 247-48.)  Mayweather

then went back to the apartment complex and saw Thomas, who did not move or respond to

Mayweather.  (<u>Id.</u> at 249-50.)

Bobby Smith testified he and Mayweather, his wife's cousin, were hanging out on

September 8, 2000, and stopped by an apartment complex where Mayweather saw Thomas,

a friend of Mayweather's, on a balcony.  (<u>Id.</u> at 312-15.)  While the three men were hanging

out together on that balcony, they were robbed by two men, one with a gun displayed and

one without a gun displayed.  (<u>Id.</u> at 317, 320-24.)  The one with the gun said "This is a

robbery," and the man without the gun "search[ed] everybody."  (<u>Id.</u> at 324, 325, 343.)

Smith and Mayweather tried to jump off the balcony at the same time but the man without

the gun pulled Mayweather back on to the balcony.  (<u>Id.</u> at 324-27.)  Smith successfully

jumped off the balcony and ran away, hearing one shot after he landed, followed by four to

five more shots.  (<u>Id.</u> at 328-29.)  After he saw the white car pull away, he returned to the

balcony, saw Mayweather with Thomas, and then left.  (<u>Id.</u> 330-31.)

On September 8, 2000, Taylor, who lived in the apartment complex, saw her ex-

boyfriend, Arthell Harris, there with a person she first identified as "O.E." and then identified

as Petitioner, driving past her in a white car with temporary plates before she heard five

gunshots.  (<u>Id.</u> at 452-55.)  After hearing the shots, she saw Petitioner and another man run

to the white car which pulled off.  (<u>Id.</u> at 455-56.)

In January 2001, Mayweather identified Petitioner in a photo lineup as one of the

persons who robbed him on September 8, 2000, and identified that person as the same person

who was in court.  (Id. at 254-59.)  In May 2001, through a photo lineup and a live lineup, Mayweather identified the man holding the gun; and stated he did not see that person in court.  (Id. at 259-66.)  Also in May 2001, Smith identified Petitioner in a photo lineup, and identified that person as the same person who was in court, the person who was not holding the gun and who had pulled Mayweather back as he tried to jump.  (Id. at 328, 333-37.)  In May 2001 Smith viewed another photo lineup in which he identified the man holding the gun.  (Id. at 337-39.)

On January 17, 2001, then-Detective Scott interviewed Petitioner after giving him his Miranda[6] rights and Petitioner admitted, during an unrecorded statement and a tape-recorded statement, that he had participated, with two other men, in the robbery of Thomas, Mayweather, and Smith on September 8, 2000.  (Id. at 530-44.)  The tape-recorded statement was played for the jury.  (Id. at 539-43.)

Mayweather also testified that in the late 1990's he had been on probation after pleading guilty to a first degree tampering charge.  (Id. at 268, 293.)  During cross-examination, Mayweather acknowledged he pleaded guilty to that first degree tampering charge, and then responded, "No" when asked if he was guilty of that offense.  (Id. at 276-77.)  As Petitioner's counsel began to ask Mayweather a question that began "when you pled guilty --," the prosecutor objected that "[t]his has nothing to do with this case at all.  It's already been brought out anyway."  (Id. at 277.)  Petitioner's counsel countered that "[i]t has

---

[6] **Miranda v. Arizona**, 384 U.S. 436 (1966).

to do with [Mayweather's] truth and veracity." (Id.) The trial court sustained the prosecutor's objections to further questioning of Mayweather about his earlier plea to the tampering charge and his testimony that he was not guilty of that earlier charge. (Id. at 277-79, 291-92, 296-98.)

During trial, Petitioner's counsel reported a juror "was writing jokes in his [note] pad and passing it around to the other members of the jury." (Id. at 503.) The trial court responded that it had not seen anything like that occur and had not seen anything inappropriate occur with regard to the jurors. (Id. at 503-04.)

In accordance with the jury's verdict finding Petitioner guilty of the charged offenses, the trial court sentenced Petitioner, as a prior offender, on December 7, 2001, to multiple concurrent and consecutive terms of imprisonment totaling life plus ten years. (Resp't Ex. B at 4, 67-69, 110-11). After sentencing, Petitioner responded "no" to the following questions the trial court asked him: if there were any witnesses Petitioner knew of that his attorney did not contact, if there was "any possible defense that [Petitioner] might have had to these charges that [the attorney] didn't look into"; and if there was "anything [the attorney] could have done that he didn't do." (Resp't Ex. A at 112-13.) Petitioner also acknowledged he was satisfied with his attorney's services and had no complaints or criticisms of his attorney. (Id. at 113-14.)

Petitioner timely appealed on the grounds the trial court had erred in (1) refusing to strike Juror Number 12 for not unequivocally stating she could be fair and impartial knowing that the charges involved a murder; (2) not permitting Petitioner to cross-examine witness

Mayweather on the fact he lied during an earlier plea of guilty to a crime he claimed not to have committed; and (3) not investigating, and not declaring a mistrial if the report was true, a report of juror misconduct in the passing of allegedly humorous notes while evidence was presented. (Resp't Ex. C at 10-12, 13, 19, 24.)

On October 15, 2002, the appellate court affirmed the conviction and sentence in a per curiam order with an unpublished memorandum in support. (Resp't Ex. E; **State v. Ming**, 87 S.W.3d 887 (Mo. Ct. App. 2002) (per curiam).) With respect to Petitioner's argument that the trial court erred in failing to sustain Petitioner's challenge for cause to Juror Number 12 due to her alleged failure to "state absolutely that she could be impartial," the appellate court found no prejudicial error because the trial court "could properly conclude that the juror's final answer could correct any equivocation she might have shown. <u>State v. Smith</u>, 649 S.W.2d 417, 425-26 (Mo. banc 1983)."[7] (Resp't Ex. E at 2-3.) With respect to Petitioner's second argument that the trial court erred in not allowing Petitioner

> to cross-examine a witness who had pled guilty to tampering with a motor vehicle, and later claimed that he was not guilty[, t]he witness testified that he did plead guilty and that he was not guilty. At this point the trial judge sustained an objection to further questioning. The inconsistency was in the record and counsel could argue it. [Petitioner] made no further offer concerning the circumstances of the witness's plea. He has not demonstrated prejudicial error in the court's ruling.

(<u>Id.</u> at 3.) For the third point on appeal, the appellate court stated Petitioner argued

---

[7] The <u>State v. Smith</u> opinion was subsequently overruled to the extent the case required "a showing of a real probability of injury with respect to the trial court's ruling on the qualification of a potential juror." **Joy v. Morrison**, 254 S.W.3d 885 (Mo. 2008) (en banc) (per curiam).

the trial court erred in failing to investigate a report of juror misconduct, asserting that there was a report that a juror was observed passing humorous notes to other jurors. The judge said that he had not observed anything out of line and that he did not believe that the jurors had missed any crucial testimony. There was no request for a hearing outside the presence of the jury or for further inquiry. Under these circumstances, we see no basis for further inquiry.

(Id. at 3.)

The appellate court issued its direct-appeal mandate on November 18, 2002. See **State v. Ming**, ED80538 (Mo. Ct. App. Nov. 18, 2002) Missouri Case.net https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Aug. 2, 2010). Petitioner did not seek transfer to the Missouri Supreme Court and did not petition the United States Supreme Court for a writ of certiorari. (See id.; Pet. at 3 [Doc. 3].)

Petitioner filed a timely pro se motion for post-conviction relief on February 7, 2003, and then, through counsel, an amended motion for post-conviction relief.[8] (See Resp't Ex. F at 1.) In his amended motion, Petitioner argued his trial counsel was ineffective (a) in failing to call Rhonda Ming, Petitioner's mother, and Quita Ming, Petitioner's sister, who would have testified that Petitioner was out of town at the time of the robbery and murder

---

[8] Upon the filing of the timely amended post-conviction motion, any claims in the pro se motion for post-conviction relief were no longer before the motion court except to the extent they were included in the amended motion. See **Tinsley v. State**, 258 S.W.3d 920, 927 (Mo. Ct. App. 2008) ("the only claim which the motion court could have considered and determined was that raised in the amended . . . motion for post-conviction relief [because t]he filing of an amended motion superseded [the] pro se motion and rendered it a nullity" (citations omitted)); **Day v. State**, 143 S.W.3d 690, 693-94 (Mo. Ct. App. 2004) ("The amended motion supersedes [the] pro se motion and renders it a nullity. . . . . Therefore, the allegations of a timely-filed amended motion would be the only matters before the motion court" (citation omitted)); **Leach v. State**, 14 S.W.3d 668, 670-71 (Mo. Ct. App. 2000) (a pro se allegation not included in the amended motion for post-conviction relief is "not properly before the motion court").

(Resp't Ex. F at 11-18); and (b) in failing to object to the juror misconduct when "a juror was passing humorous notes to other jurors while evidence was being presented," noting that counsel mentioned it to the trial court but "sought no investigation or hearing on the matter" (id. at 18-22).

The motion court[9] conducted an evidentiary hearing at which Petitioner's telephone deposition was admitted and several witnesses testified. (Resp't Ex. F at 26-38; Resp't Ex. G, Hrg. Tr. dated Nov. 14, 2003 at 13; Resp't Ex. G, Hrg. Tr. dated Dec. 4, 2003.) In his deposition, Petitioner stated he stayed with his sister, Quita Ming, in Kansas City in September 2000. (Resp't Ex. F at 9-10.) During the evidentiary hearing, Rhonda Ming (Resp't Ex. G Hrg. Tr. dated Nov. 14, 2003 at 3-13) and Quita Ming (id. at 13-20) testified that Petitioner was staying with his sister, Quita Ming, in Kansas City, Missouri from Labor Day weekend 2000 until the end of September 2000. (Id. at 4-6, 13-14). Petitioner's mother, Rhonda Ming, further testified that she told Petitioner's attorney that Petitioner had been with his sister in Kansas City in September 2000, but Petitioner's attorney did not ask her to appear and testify at trial. (Id. at 7.) Petitioner's sister, Quita Ming, testified that she did not meet Petitioner's counsel prior to trial and was not asked by counsel to testify on Petitioner's behalf. (Id. at 16.) Petitioner's mother and sister both stated that they would have testified if Petitioner's attorney had asked them to, and they would have testified at trial in substantially the way they had testified during the evidentiary hearing. (Id. at 7-8, 16-17.)

_____

[9] The judge presiding over the post-conviction motion proceedings also presided over the trial proceedings.

Petitioner's trial attorney also testified during the evidentiary hearing. (Resp't Ex. G, Hrg. Tr. dated Dec. 4, 2003 at 1-12.) Counsel testified that he had spoken to Petitioner and his mother and father on several occasions prior to trial, had looked into the alibi, and Petitioner's family had come across plane tickets to Kansas City

> [b]ut the dates didn't coincide. It was very close, but it was four or five days prior to the occurrence of the crime. . . . That was the closest we could come to saying here is something written that shows a date span. It didn't cover the time of the event. . . . If we had been able to substantiate it, we would have produced it at trial. . . . [W]e were never able to do that.

(Id. at 3-8; 11.) Counsel also stated he brought to the attention of the trial judge the juror passing notes to another juror, but did not request further relief. (Id. at 9-11.)

During the evidentiary hearing, Michael Mettes, an Assistant Public Defender with the Missouri State Public Defender's System, testified that he watched Petitioner's trial because, at the time, he was representing Petitioner's co-defendant, Herman Shelton. (Id. at 12-13.) While a sidebar or break in the trial proceedings occurred, he had seen one juror show an alternate juror something and the alternate juror laughed; and he reported the occurrence to Petitioner's counsel. (Id. at 13-14.)

On July 13, 2005, the motion court denied Petitioner's post-conviction motion, finding Petitioner's trial attorney had not provided ineffective assistance of counsel. (Resp't Ex. F at 53-54.) With regard to whether or not Petitioner's trial counsel had failed to investigate and present an alibi defense, the motion court concluded that Petitioner's counsel "was credible and persuasive" and the others testifying on this point were not credible. (Id. at 49.) The motion court also pointed out that, at the end of trial, Petitioner had been questioned by

the trial court and stated that his attorney had answered all of his questions and had investigated possible defenses; that he did not know of anything else that could have been done in his defense and did not know of other witnesses that could have been called on his behalf; and, that he did not have any complaints or criticisms regarding his counsel's representation. (Id. at 49-50.) With respect to Petitioner's ineffective assistance of counsel claim based on the alleged juror misconduct, the motion court found Petitioner's counsel brought the matter to the attention of the trial court; the trial court indicated it had not seen anything "improper pertaining to the jury" and "would closely monitor the jury during the remainder of trial"; and "[n]o other instances were brought to the attention of the court or observed by the court." (Id. at 50.)

Petitioner filed a timely appeal on August 12, 2005. (Resp't Ex. F at 55.) In that appeal, Petitioner raised only one point, that his trial attorney was ineffective in failing to investigate and call Rhonda Ming and Quita Ming to testify on his behalf and he was prejudiced by this failure because the evidence would have established that Petitioner was with Quita Ming at the time of the robbery and murder. (Resp't Ex. H at 6, 7.)

In a per curiam order, the appellate court affirmed the post-conviction court's judgment on August 22, 2006. (Resp't Ex. J; **Ming v. State**, 198 S.W.3d 657 (Mo. Ct. App. 2006 ) (per curiam).) In relevant part, the appellate court denied Petitioner relief, stating in an unpublished memorandum supporting the order that:

> During the evidentiary hearing, [Petitioner's] Mother and Sister both stated they would have testified that [Petitioner] was in Kansas City when the crimes were committed. However, the motion court found that the testimony

of [Petitioner's] Mother and Sister was not credible. [Petitioner's counsel] testified that he investigated an alibi defense and thoroughly discussed with [Petitioner]'s parents the possibility of [Petitioner] having been out of town during the occurrence of the crimes. [Petitioner's counsel] also testified that [Petitioner]'s family could not state exactly when they believed [Petitioner] had been in Kansas City. Finally, [Petitioner's counsel] testified that, if he could have substantiated a claim that [Petitioner] was in Kansas City when the crimes occurred, then he would have produced such evidence at [Petitioner]'s trial. The motion court found the testimony of [Petitioner's counsel] to be credible. Thus, there is evidence that [Petitioner's counsel]'s failure to call [Petitioner's] Mother and Sister as witnesses was a matter of sound trial strategy. Therefore, the motion court did not clearly err in finding that [Petitioner's counsel] did not provide ineffective assistance by failing to call [Petitioner's] Mother and Sister to testify at [Petitioner]'s trial.

(Resp't Ex. J at 3-4.) The appellate court issued its post-conviction mandate on September 13, 2006. See **Ming v. State**, ED86742 (Mo. Ct. App. Sept. 13, 2006), at https://www.courts.mo.gov/casenet/cases/searchDockets.do (last visited Aug. 2, 2010).

Petitioner then filed his petition for federal habeas relief presenting four claims for relief, the three grounds raised in Petitioner's direct appeal and the ground raised in Petitioner's post-conviction appeal. Specifically, Petitioner contends his federal constitutional rights were violated by (1) the trial court's failure to allow Petitioner to question Mayweather about lying under oath during his earlier guilty plea to a crime he claimed he had not committed; (2) the trial court's refusal to strike for cause Juror Number 12 because she did not unequivocally state she could be fair and impartial knowing the case involved a murder charge; (3) the trial court's failure to investigate the report of juror misconduct and, if the report was found to be true, failure to declare a mistrial; and (4) Petitioner's trial attorney's failure to investigate and call Rhonda Ming and Quita Ming, who

-13-

would have testified that Petitioner was in Kansas City at the time of the crimes.  (Pet. at 1, 3-4, 6-7, and 9 [Doc. 3].)

Respondents counter that the petition is untimely and the claims lack merit.

## Discussion

Timeliness.   "The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) establishes a 1-year time limitation for a state prisoner to file a federal habeas corpus petition.  That year runs from the latest of four specified dates.  28 U.S.C. § 2244(d)(1)."  **Jimenez v. Quarterman**, 129 S.Ct. 681, 683 (2009).  The first specified date is "'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'"  **Id.** (quoting 28 U.S.C. § 2244(d)(1)(A)).  This first possible date is the date relevant to this federal habeas proceeding.

When, as in this case, the petitioner does not seek transfer to the Missouri Supreme Court, the direct review becomes final when the appellate court issues the direct appeal mandate.[10]  **Riddle v. Kemna**, 523 F.3d 850, 855, 856 (8th Cir. 2008) (en banc).  In such

_____

[10]  In their Response, Respondents suggest that Petitioner's time for seeking direct review ended on October 30, 2002, or fifteen days after the appellate court's October 15, 2002, per curiam order affirming the trial court's judgment, because Petitioner did not seek a transfer.  (Resp't Response at 4 [Doc. 12] ("The Missouri Court of Appeals affirmed [P]etitioner's conviction and sentence on October 15, 2002 (Respondent Exhibit [E]).  Petitioner had fifteen days in which to file an application to transfer with the Missouri Court of Appeals.  Missouri Supreme Court Rules 30.26, 83.02, 84.17.  Petitioner did not file a post-opinion motion; thus, the expiration of time for seeking further direct review occurred on October 30, 2002.")  The appellate court's mandate, however, was not filed until after that fifteen day period, or on November 18, 2002.  In such circumstances, the date the mandate is issued is the relevant date for purposes of determining when direct review has concluded.  **Riddle v. Kemna**, 523 F.3d 850, 856 (8th Cir. 2008) (en banc).  Due to the **Riddle** opinion, which was issued after Respondents filed their response in this case, the Court will not use the October 30, 2002, date Respondents used to calculate whether or not Petitioner's federal habeas

circumstances, the federal habeas court does not include in the period provided by 28 U.S.C. § 2244(d)(1)(A) the ninety day period allowed for filing a petition for certiorari to the United States Supreme Court because the United States Supreme Court could not review the petitioner's direct appeal due to the absence of a decision by the state court of last resort, the Missouri Supreme Court. **Id.** at 855. Therefore, in these situations, "the statute of limitations in 28 U.S.C. § 2244(d)(1) [begins] the day after the direct-appeal mandate" is issued. **Id.** at 856; accord **McMullan v. Roper**, 599 F.3d 849, 852 (8th Cir. 2010) (when no petition for writ of certiorari was filed with the United States Supreme Court, the "state court judgment became final . . . the day after the direct appeal mandate was issued by the Missouri Court of Appeals").

Here, the Missouri Court of Appeals issued its direct-appeal mandate on November 18, 2002, and Petitioner did not request transfer to the Missouri Supreme Court or file a petition for writ of certiorari with the United States Supreme Court. Therefore, the one year limitation period for the filing of Petitioner's federal habeas petition began on November 19, 2002, the day after the direct-appeal mandate issued, and would end one year later, on Wednesday, November 19, 2003, if other proceedings did not affect the calculation of the one year period. See, e.g., 28 U.S.C. § 2244(d)(2).

That statutory provision states that "[t]he time during which a properly filed

---

petition was timely. Instead, the Court will calculate the timeliness of Petitioner's petition based on the later date of November 18, 2002, the date on which the Missouri Court of Appeals issued its direct-appeal mandate.

application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Petitioner timely filed his post-conviction motion on February 7, 2003. The time between the conclusion of the direct appeal on November 18, 2002, and this date, however, does not toll the AEDPA's one-year statute of limitations. **McMullan**, 599 F.3d at 852. A total of 81 days passed between November 19, 2002, the day after issuance of the direct-appeal mandate, and February 7, 2003, the date Petitioner filed his post-conviction motion, leaving 284 days in which to file the federal habeas petition. **Id.** (a petitioner who used 81 days between the issuance of the direct appeal mandate and the filing of the post-conviction petition had "284 days to file a federal habeas petition"). The post-conviction motion was denied on July 13, 2005.

"State [post-conviction proceedings] are 'pending' for the period between the [motion] court's denial of the [post-conviction motion] and the timely filing of an appeal from it." **Maghee v. Ault**, 410 F.3d 473, 475 (8th Cir. 2005). Petitioner timely filed his post-conviction appeal on August 12, 2005. Therefore, Petitioner's post-conviction motion tolled the statutory one-year period within which Petitioner had to file a federal habeas petition until the appellate court issued its post-conviction mandate. **McMullan**, 599 F.3d at 852. The appellate court issued the post-conviction mandate on September 13, 2006. The next day, September 14, 2006, is the date on which the statute of limitations period began to run again. Petitioner signed his federal habeas petition on June 27, 2007, the same date on which the petition was mailed. (See Pet. and its envelope [Docs. 3 and 3-6].) A total of

286 days passed between September 14, 2006 and June 27, 2007, the date Petitioner signed and mailed his federal habeas petition. Adding that period of time to the 81 days that passed between the issuance of the direct-appeal mandate and the filing of Petitioner's post-conviction motion means that Petitioner filed his federal habeas petition 367 days, rather than 365 days, after the Missouri appellate court filed the direct-appeal mandate. Therefore, Petitioner's federal habeas petition was filed two days too late and is untimely.

Although Petitioner did not timely file his federal habeas petition within the one-year period set forth in 28 U.S.C. §2244(d)(1), his federal habeas petition may be considered timely if he is entitled to equitable tolling of that one year period. Because § 2244(d)(1) is a "statute of limitations rather than a jurisdictional bar," equitable tolling "may be available to toll th[at] time limit under certain circumstances." **Earl v. Fabian**, 556 F.3d 717, 722 (8th Cir. 2009). The Eighth Circuit applies equitable tolling under the AEDPA in limited circumstances, while noting "the Supreme Court has never expressly held that [the] AEDPA permits equitable tolling" and has assumed "it does without deciding the question." **Id.** (citing Lawrence v. Florida, 549 U.S. 327, 336 (2007)).

In **Burns v. Prudden**, 588 F.3d 1148, 1150-51 (8th Cir. 2009), the Eighth Circuit held that the doctrine of equitable tolling might apply to a habeas petition filed when its established law held that the statute of limitations did not begin to run until 90 days after the Missouri Court of Appeals denied an appeal. "This 90-day period was permitted because Nichols[ v. Bowersox, 172 F.3d 1068 (8th Cir. 1999) (en banc)] held that in that time period, a petitioner could file a petition for a writ of certiorari in the United States Supreme Court,

regardless of whether the petitioner had filed a petition for transfer to the Missouri Supreme Court." **Id.** at 1150. The <u>Nichols</u> decision was overruled by the <u>Riddle</u> decision in April 2008. **Id.** Noting that "'[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way,'" the court held that the overruling of its <u>Nichols</u> en banc decision in April 2008 was "an extraordinary circumstance." **Id.** at 1150-52 (quoting <u>Riddle</u>, 523 F.3d at 857).

Petitioner, like Burns, filed his habeas petition while <u>Nichols</u> was the law. Petitioner, like Burns, did not petition the United States Supreme Court for a writ of certiorari; however, as in **Burns**, if the 90-day period for filing a petition for writ of certiorari with the United States Supreme Court tolled the statute,[11] his petition would have been timely filed.

In **Burns**, the Eighth Circuit remanded the case for findings on the other requirement for equitable tolling – whether the petitioner had diligently been pursuing her rights. **Id.** at 1152. In the interests of judicial economy, however, the Court will address the merits of the petition rather than engage in a fact-finding hearing on the issue of timeliness or of whether

---

[11] The Eighth Circuit noted that "[t]he difference between the dates when the statute of limitations begins to run under <u>Nichols</u> and <u>Riddle</u> will generally be fewer than 90 days" because under <u>Riddle</u> if a defendant does not file a motion to transfer to the Missouri Supreme Court, the date of the appellate court's mandate is the end of the direct appeals process but the 90-day period for filing a petition for certiorari begins "from the earlier date of the final order denying the appeal." **Burns,** 588 F.3d at 1151 n.2. The 34-day difference between October 15, 2002, the date the appellate court issued the order denying the direct appeal, and November 18, 2002, the date the appellate court issued its direct-appeal mandate, would not affect the timely filing of Petitioner's petition. Affording Petitioner the benefit of the 90-day period under <u>Nichols</u> more than compensates for the additional 34 days used from the date the direct appeal was denied.

Petitioner diligently pursued his rights.  See **Shelton v. Purkett**, 563 F.3d 404, 407 (8th Cir.), cert. denied, 130 S.Ct. 739 (2009) (reaching merits of federal habeas petition rather than remanding for development of factual issue of whether the petitioner was diligently pursuing his rights); **Trussell v. Bowersox,** 447 F.3d 588, 590 (8th Cir. 2006) (reaching merits of habeas petition rather than remanding for development of factual issue of timeliness).

Merits of Petition.  Title 28 U.S.C. § 2254(d) mandates that a federal court grant habeas relief on a claim that was adjudicated on its merits by the State courts *only* if the adjudication "'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'" or "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" **Collier v. Norris**, 485 F.3d 415, 421 (8th Cir. 2007) (quoting § 2254(d)); accord **Christenson v. Ault**, 598 F.3d 990, 994 (8th Cir. 2010).  "'[A] decision is "contrary to" federal law . . . if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or if it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrived at an opposite result.'" **Collier**, 485 F.3d at 421 (quoting Davis v. Norris, 423 F.3d 868, 874 (8th Cir. 2005)) (all but first alteration in original); accord **Losh v. Fabian**, 592 F.3d 820, 823 (8th Cir. 2010).  "'A state court unreasonably applies clearly established federal law when it "identifies the correct governing principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

facts of the prisoner's case.'"" **Collier**, 485 F.3d at 421 (quoting <u>Davis</u>, 423 F.3d at 874) (alteration in original). This standard requires that the state court's application be "objectively unreasonable." **Mark v. Ault**, 498 F.3d 775, 786 (8th Cir. 2007); <u>see</u> **Losh**, 592 F.3d at 823 (under the unreasonable application clause of the AEDPA, a habeas petition may be granted "only if the state court applied the correct governing legal principle in an objectively unreasonable manner"). "It is not enough for the federal habeas court to conclude that, in its independent judgment, it would have applied federal law differently from the state court. . . ." **Mark**, 498 F.3d at 786. Importantly, "[o]nly rulings in Supreme Court decisions issued before the state court acts are considered clearly established federal law, for a state court does not act contrary to or unreasonably apply clearly established federal law if there is no controlling Supreme Court holding on point." **Losh**, 592 F.3d at 823 (citations omitted). The state court does not need to cite to Supreme Court cases, "'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" **Revels v. Sanders**, 519 F.3d 734, 739 (8th Cir.), <u>cert. denied</u>, 129 S.Ct. 598 (2008) (quoting <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam)).

"[T]he 'summary nature' of the [state court's] discussion of [a] federal constitutional question does not preclude application of [§ 2254's] standard." **Brown v. Luebbers**, 371 F.3d 458, 462 (8th Cir. 2004) (en banc); <u>accord</u> **Weaver v. Bowersox**, 438 F.3d 832, 839 (8th Cir. 2006) (quoting <u>Brown</u>, 371 F.3d at 462). A state court's summary decision is presumed to be on the merits for purposes of habeas review. **Carter v. Bowersox**, 265 F.3d

705, 712 (8th Cir. 2001); see **Weaver** 438 F.3d at 839 (concluding a summary disposition by the Missouri Supreme Court was an "adjudication of the [habeas claims] on the merits").

Additionally, in a federal habeas action pursued by a state prisoner, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The deference owed by a federal habeas court to a state court's findings of fact includes deference to state court credibility determinations, **Smulls v. Roper**, 535 F.3d 853, 864 (8th Cir. 2008) (en banc), cert. denied, 129 S.Ct. 1905 (2009), and to "[a] state court's findings of fact made in the course of deciding" an ineffective assistance of counsel claim, **Odem v. Hopkins**, 382 F.3d 846, 849 (8th Cir. 2004). Moreover, the presumption of correctness of findings of fact applies to the factual determinations made by both the state trial court and the state appellate court. **Smulls**, 535 F.3d at 864-65.

Ground One: Cross-examination. Petitioner urges his federal constitutional right to confrontation was violated by the trial court's failure to allow Petitioner to question Mayweather about lying under oath during his earlier guilty plea to a crime he claimed he had not committed.

An essential purpose of the Confrontation Clause "'is *to secure for the opponent the opportunity of cross-examination*.'" **Delaware v. Van Arsdall**, 475 U.S. 673, 679 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 315-16 (1974)).[12] "[O]ne goal of effective cross-

---

[12] Petitioner cites **Davis v. Alaska**, 415 U.S. 308 (1974) in support of ground one.

examination is to impeach the credibility of opposing witnesses." **Newton v. Kemna**, 354 F.3d 776, 781 (8th Cir. 2004). Thus, "'the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.'" **Id.** (quoting Davis, 415 U.S. at 316). "The Supreme Court has emphasized that 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" **Id.** (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)).

Although the focus of the Confrontation Clause is on individual witnesses**, Van Arsdall**, 475 U.S. at 680, Confrontation Clause violations are subject to a harmless-error analysis, **id.** at 684. When deciding whether there was such error, the Court examines the "importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the strength of the prosecution's case." **Id.**

Without deciding whether or not the trial court's limitation on Petitioner's cross-examination of Mayweather violated the Confrontation Clause, the Court concludes any such violation constitutes harmless error. While Mayweather's testimony included a recounting of the crimes and the identification of Petitioner as one of the robbers, the one who was not holding the gun and who had kept Mayweather from jumping off the balcony during his first

attempt to get away (Resp't Ex. A at 225-26, 229-35, 237-42, 247-50, 254-66), the jury also heard testimony from another victim, Smith, who recounted the part of the crimes in which he participated as a victim and who identified Petitioner as one of the two men robbing them, as the man without the gun who had "search[ed] everybody" and had kept Mayweather on the balcony when Mayweather first tried to get away.  (Id. at 312-15, 317, 320-31, 333-39, 343.)  The jury also heard testimony from Taylor, who identified Petitioner as one of the individuals running to the white car that drove away from the scene after shots were fired. (Id. at 452-56.)  Additionally, the jury heard the Petitioner's tape-recorded statement in which Petitioner admitted his involvement in the crimes.  (Id. at 541-43.)  The testimony of Smith and Taylor, as well as Petitioner's tape-recorded statement, corroborate Mayweather's testimony regarding what happened during the robbery on September 8, 2000, and who was involved in the crimes, and provides strong support for the prosecution's case.  Moreover, Petitioner's cross-examination of Mayweather brought out Mayweather's statement that he did not commit the earlier tampering charge to which he had pleaded guilty, and covered other areas of questioning.  (Id. at 276-77, 270-93.)

Due to the overwhelming evidence of Petitioner's guilt and the corroboration of Mayweather's testimony by other evidence, the state appellate court's determination that Petitioner "had not demonstrated prejudicial error in the [trial] court's" limitation on the cross-examination of Mayweather is supported by the record and, although the state court's determination did not clearly "address[] a constitutional issue, nevertheless [it] did not result in a decision that was contrary to or involved an unreasonable application of clearly

established federal law." **Guinn v. Kemna**, 489 F.3d 351, 358 (8th Cir. 2007). Ground one is without merit.

Ground Two: Biased Juror. Petitioner argues he was denied his right to due process of law in the trial court's refusal to strike for cause Juror Number 12 because she did not unequivocally state she could be fair and impartial knowing the case involved a murder charge.

"Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ." **Smith v. Phillips**, 455 U.S. 209, 217 (1982). The question whether a juror should be disqualified due to bias is "plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." **Patton v. Yount**, 467 U.S. 1025, 1036 (1984). "[W]hether a juror can in fact [lay aside an opinion and render a verdict based on the evidence presented in court] is a determination to which habeas courts owe special deference." **Id.** at 1037 n. 12. This is because "under our system it is [the trial] judge who is best situated to determine [a juror's] competency to serve impartially." **Id.** at 1039. Therefore, "the question is whether there is fair support in the record for the state courts' conclusion that the juror[] here would be impartial." **Id.** at 1038.

Here, after voir dire the trial court found Juror Number 12 was not biased (Resp't Ex. A at 176) and on direct appeal the Missouri Court of Appeals found no prejudicial error in the trial court's decision (Resp't Ex. E at 3), which may be interpreted as the appellate court's determination that Juror Number 12 was not biased. See **Sanders v. Norris**, 529 F.3d 787,

791 (8th Cir. 2008) (noting the context of a court's conclusion may show the court's finding is that a juror is not biased, and concluding a state supreme court's determination that the petitioner had failed to show "actual bias" was a finding that the juror was not biased). There is fair support in the record for the state courts' conclusion regarding the impartiality of Juror Number 12 based on the voir dire examination, especially the last question posed by the trial court asking whether anyone, if selected as a juror in the case, could not follow the instructions given by the court, to which no juror responded. (Resp't Ex. A at 173.) Because Petitioner " has no clear and convincing evidence to the contrary, [this Court] must accept the state court's factual finding that [Juror Number 12] was not actually biased." **Id.**

Petitioner cites **Witherspoon v. Illinois**, 391 U.S. 510 (1968), in support of ground two. That case is distinguishable, however, because there the Supreme Court found a death sentence could not be carried out by a jury selected by excluding those who voiced general objections to the death penalty or expressed reservations against infliction of the death penalty, finding that, in deciding what punishment to impose, such a jury "fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments." **Id.** at 518. This case did not involve the death penalty and did not have such a jury empaneled. Moreover, the challenge in this case was to the trial court's failure to strike a juror for cause, not the trial court's exclusion of jurors, which was at issue in **Witherspoon**. Ground two is without merit.

Ground three: Juror Misconduct. Petitioner argues that his rights to a fair and impartial jury and to due process of law were violated by the trial court's failure to

investigate the report of juror misconduct and, if the report was found to be true, failure to declare a mistrial.

"[A]n evidentiary hearing [is necessary] where extrinsic influence or relationships have tainted the [jury's deliberations]." **Tanner v. United States**, 483 U.S. 107, 120 (1987) (citing Smith, supra, and Remmer v. United States, 347 U.S. 227 (1954)). A trial court is not, however, obliged to conduct an inquiry regarding every report of alleged jury misconduct. See, e.g., **Tunstall v. Hopkins**, 306 F.3d 601, 609-11 (8th Cir. 2002) (trial court not under an obligation to voir dire jury regarding mid-trial publicity upon a report there was a newspaper in the jury room); **King v. Bowersox**, 291 F.3d 539, 541 (8th Cir. 2002) (state trial court had no duty to conduct an inquiry based upon a report a photograph of a victim and certain memorial effects had been placed across the hall from the jury room door, because there was no "showing that the jury saw or was even aware of the hallway display"). "[T]he hearing required or 'the depth of investigation required [by the court] depends on both the gravity of the alleged [jury] misconduct and the substantiality of the [petitioner]'s showing of misconduct.'" **Tunstall**, 306 F.3d at 611 (quoting United States v. Tucker, 137 F.3d 1016, 1030 (8th Cir. 1998) (second alteration in original).

While acknowledging the Supreme Court has not expressly addressed whether a trial court must sua sponte engage in further inquiry upon receiving a report of juror misconduct, the Court will consider the merits of this claim because the Eighth Circuit's decision in **Tunstall** considered whether the trial court, without a request to voir dire the jury, should have voir dired the jury after receiving a report the jury had been exposed to mid-trial

publicity through a newspaper in the jury room.  See **Tunstall**, supra.  Additionally, a 1954 decision of the Supreme Court may support a determination a trial court has an obligation sua sponte to pursue a hearing about jury communications of which it is aware in certain circumstances, such as when a trial judge knows of a third party's remark to a juror that the juror "could profit by bringing in a verdict favorable to the" defendant.  **Remmer v. United States**, 347 U.S. 227, 228 (1954).

In **Remmer**, the trial judge learned of the communication from the juror, consulted with the prosecutors, an investigation by the Federal Bureau of Investigation (FBI) was requested, an FBI report was received, and the report was considered by the judge and prosecutors, but the defendant was not advised of the incident.  **Id.** at 228.  After the verdict, the defendant and his attorney learned about the communication with the juror, argued in a motion for new trial that the defendant had been deprived of a fair trial, and presented "a request for a hearing to determine the circumstances surrounding the incident and its effect on the jury."  **Id.**  The district court denied the motion without a hearing.  **Id.** at 229.  The Supreme Court remanded the case to the district court to hold a hearing to determine whether the incident was harmful to the defendant and, if so, to grant a new trial.  **Id.** at 230.  In reaching its conclusion, the Supreme Court concluded

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The burden is not conclusive, but the burden rests heavily upon the

> Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

**Id.** at 229. Due to the **Remmer** decision's indication that the defendant has a right to notice and hearing on certain juror communications, for purposes of this case, the undersigned will assume without deciding that a trial court has a duty <u>sua</u> <u>sponte</u> to inquire further into jury misconduct under certain egregious circumstances. See **Boykin v. Leapley**, 28 F.3d 788, 790 (8th Cir. 1994) (assuming, without deciding, that <u>Remmer</u> "established the rule that any extrajudicial communication with a juror is presumed to deprive a criminal defendant of due process under the Fourteenth Amendment"). Even if such a duty exists, however, the circumstances of this case did not require further inquiry by the trial court. See **id.** (deciding that, even if an extrajudicial communication with a juror is presumed to deprive a criminal defendant of due process, the petitioner was not entitled to relief).

Here, the trial court received from Petitioner's counsel a report that one juror was observed to share with a second juror in open court what appeared to be, from the second juror's response, a humorous note. (Resp't Ex. A at 503.) During the post-conviction motion hearing, the person who had witnessed the sharing of notes by the jurors, testified that the jurors' conduct occurred during a break in the proceedings. (Resp't Ex. G, Hrg. Tr. dated Dec. 4, 2003, at 13, 14.) In response to Petitioner's counsel's report of the jurors' conduct, the trial court stated it had not seen that, or anything else inappropriate, occur with regard to the jurors. (<u>Id.</u> at 503-04.) No other reports of similar conduct by the jurors were presented to the trial court. No further inquiry by the trial court occurred or was requested.

The circumstances here did not involve "extrinsic influence or relationships [that might] have tainted the [jury's deliberations]." Under the circumstances, no duty of the trial court to conduct further inquiry about juror misconduct arose.

The Eighth Circuit's decision in **Eaton v. Wyrick**, 528 F.2d 477 (8th Cir. 1975), did not require the trial court to conduct a hearing under the circumstances here. In that case, a claim of juror misconduct arose, after completion of trial but before jury deliberations, when the petitioner's counsel advised the trial court "that the state's complaining witness had been seen in conversation with the foreman of the jury after the jurors had been selected but before they had been sworn." **Id.** at 480. As in the present case, no evidentiary hearing was requested and the trial court overruled the petitioner's motions for new trial, in which the issue was raised, after oral argument. **Id.** at 481. On direct appeal "the Missouri Supreme Court concluded there had been 'no showing that anything relating to the case on trial was discussed during the conversation or that any prejudice to [the petitioner]'s rights resulted.'" **Id.** (quoting State v. Eaton, 504 S.W.2d 12 (Mo. 1973)). In remanding for a hearing, the Eighth Circuit stated

> It is well settled that it is the duty of the trial court to hear and consider allegations of juror misconduct, in order to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial * * *." Remmer . . ., 347 U.S. [at] 229-30 . . . . The record discloses that such a hearing was not conducted by the state trial court. The state trial court thus lacked sufficient evidence upon which to determine whether prejudice resulted to petitioner in such a magnitude as to warrant a new trial. Similarly, the direct appeal on this issue lacked an adequate record upon which the Missouri Supreme Court could review the issue on the merits.

> An evidentiary hearing will be required to resolve this issue. . . . [I]n the

> unusual circumstances of this case the state courts should be accorded an opportunity to conduct an evidentiary hearing

to allow a record to be made which can be reviewed. **Id.** Unlike **Eaton**, no outsider communication with the jury was involved in this case. Rather, the circumstances alleged here involve a communication between two jurors in open court during a break in the trial proceedings. Therefore, **Eaton**, supra, is distinguishable and did not require further inquiry by the state trial court of the alleged juror misconduct reported during Petitioner's trial.

In support of this ground for habeas relief, Petitioner cites **Remmer v. United States**, 350 U.S. 377 (1956). That case is, however, distinguishable because it involved communications between a juror in a criminal case and an outsider regarding the verdict that should be brought in the case. **Id.**

Ground three is without merit.[13]

Ground four: Ineffective Assistance of Trial Counsel. Petitioner contends his trial attorney provided ineffective assistance of counsel by failing to investigate and call Rhonda Ming and Quita Ming, who would have testified that Petitioner was in Kansas City at the time of the crimes. (Pet. at 1, 3-4, 6-7, and 9 [Doc. 3].)

---

[13] Petitioner summarily asks this Court to grant an evidentiary hearing on this claim, and may also be asking for an evidentiary hearing on all of his habeas claims. Compare Pet. at 9 (Doc. 3 at 21) with Reply at 26 (Doc. 16 at 26). Respondent has not addressed these requests. Only when a "habeas petitioner 'was unable to develop his claim in state court despite diligent effort' is an evidentiary hearing not barred by [28 U.S.C.] § 2254 (e)(2)." **Williams v. Norris**, 576 F.3d 850, 860 (8th Cir. 2009), petition for cert. filed, __ U.S.L.W. __ (U.S. Apr. 22, 2010) (No. 09-10382) (quoting Williams v. Taylor, 529 U.S. 420, 437 (2000)). Petitioner has not shown he was unable to develop any of his habeas claims in state court "despite [his] diligent effort." Moreover, Petitioner "has not argued that either exception in § 2254(e)(2)(A) and (B) applies, and it is apparent that neither does." **Id.** at 862. Therefore, Petitioner's requests for an evidentiary hearing are denied.

An accused's Sixth Amendment right to the assistance of counsel is a right to the effective assistance of counsel. **Marcrum v. Luebbers**, 509 F.3d 489, 502 (8th Cir. 2007) (citing <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 377 (1986)). "The right to effective assistance of counsel 'is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process.'" **Smith v. Rogerson**, 171 F.3d 569, 572 (8th Cir. 1999) (quoting <u>Kimmelman</u>, 477 U.S. at 374). "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [relevant proceeding] cannot be relied on as having produced a just result.'" **Jackson v. Gammon**, 195 F.3d 349, 354 (8th Cir. 1999) (quoting <u>Kellogg v. Skon</u>, 176 F.3d 447, 452 (8th Cir. 1999)) (second alteration in original). "To show a constitutional violation of the right to counsel a [petitioner] must show first, that counsel's performance was deficient, and second that counsel's errors prejudiced the defense." **Marcrum**, 509 F.3d at 502 (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

To establish that counsel's performance was deficient, a petitioner must show that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" **Greiman v. Thalacker**, 181 F.3d 970, 972 (8th Cir. 1999) (quoting <u>Strickland</u>, 466 U.S. at 687). More specifically, a petitioner must demonstrate that "counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney." **Armstrong v. Kemna**, 534 F.3d 857, 863 (8th Cir. 2008) (citing <u>Strickland</u>, 466 U.S. at 687-

94). "Only reasonable competence, the sort expected of the 'ordinary fallible lawyer,' is demanded by the Sixth Amendment." **White v. Helling**, 194 F.3d 937, 941 (8th Cir. 1999) (quoting Nolan v. Armontrout, 973 F.2d 615, 618 (8th Cir. 1992)). The court is "highly deferential" in analyzing counsel's conduct and "indulg[es] a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment.'" **Armstrong**, 534 F.3d at 863 (quoting Middleton v. Roper, 455 F.3d 838, 846 (8th Cir. 2006)). "There is a strong presumption that counsel's strategic choices were reasonable." **Forsyth v. Ault**, 537 F.3d 887, 891 (8th Cir. 2008), cert. denied, 129 S.Ct. 1044 (2009). Moreover, "[t]here is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy." **Garrett v. Dormire**, 237 F.3d 946, 949-50 (8th Cir. 2001).

To establish prejudice, a petitioner must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" **Armstrong v. Kemna**, 590 F.3d 592, 595-96 (8th Cir.), cert. denied, 130 S.Ct. 3369 (2010) (quoting McCauley-Bey v .Delo, 97 F.3d 1104, 1105 (8th Cir. 1996)). "'A reasonable probability is [a probability] sufficient to undermine confidence in the outcome.'" **Armstrong**, 590 F.3d at 596 (quoting McCauley-Bey, 97 F.3d at 1105). The petitioner bears the burden of showing such a reasonable probability. **Lawrence v. Armontrout**, 961 F.2d 113, 115 (8th Cir. 1992).

The question of prejudice from counsel's performance need not be reached if the performance was not deficient. See **Parkus v. Bowersox**, 157 F.3d 1136, 1140 (8th Cir.

1998). Conversely, the question of counsel's allegedly deficient performance need not be reached if a petitioner has failed to show prejudice. **Williams v. Locke**, 403 F.3d 1022, 1025 (8th Cir. 2005) (citing <u>Strickland</u>, 466 U.S. at 697).

Additionally, when reviewing claims of ineffective assistance of counsel in a habeas case, the Court must "view what happened at trial through two filters, the first requiring [it] to defer to judgments of trial counsel and the second requiring [it] to defer to the state courts' application of federal law to the facts of the case." **Marcrum**, 509 F.3d at 501 (citations omitted).

A trial attorney "is required to make a reasonable investigation in preparing [a defendant's] defense, including reasonably deciding when to cut off further investigation." **Winfield v. Roper**, 460 F.3d 1026, 1034 (8th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 691). "When a claim for ineffective assistance of counsel is alleged on the basis of failing to investigate or act, the reasonableness of the nonfeasance must be assessed in light of all circumstances, and a significant degree of deference given to counsel and his or her professional judgment." **Griffin v. Delo**, 33 F.3d 895, 901 (8th Cir. 1994). "Trial counsel's strategic decisions are 'virtually unchallengeable unless they are based on deficient investigation, in which case the "presumption of sound trial strategy . . . founders on the rocks of ignorance."'" **Forsyth**, 537 F.3d at 892 (quoting <u>Link v. Luebbers</u>, 469 F.3d 1197, 1204 (8th Cir. 2006)) (alteration in original). An ineffective assistance of counsel claim based on a failure to call witnesses who might establish a defense may be rejected if those witnesses would not have established the defense or are not credible. <u>See</u> **Helmig v. Kemna**,

461 F.3d 960, 967 (8th Cir. 2006) (rejecting ineffective assistance of trial counsel claim for failure to call witnesses based, in relevant part, on state courts' findings that witnesses would not have provided defense or were not credible).

Here, the state motion court found Petitioner's trial attorney did not provide ineffective assistance of counsel due to an alleged failure to investigate and present an alibi defense upon concluding that counsel's testimony, about his investigation of the alibi defense and determination not to present it at trial because information he had received that Petitioner was in Kansas City on the day of the offenses could not be substantiated, was "credible and persuasive," and the testimony of Petitioner, Rhonda Ming, and Quita Ming indicating that Petitioner had been in Kansas City at the time of the offenses was not credible. (Resp't Ex. F at 49.) Acknowledging that the motion court found Petitioner's counsel was credible, the state appellate court noted in relevant part that Petitioner's counsel had investigated the alibi defense; had "thoroughly discussed with Petitioner's parents" the possibility that Petitioner was out of town when the crimes occurred, but the family could not state exactly when Petitioner had been in Kansas City; and had stated that he would have produced such evidence at trial if he could substantiate the claim. (Resp't Ex. J at 3-4.) The appellate court concluded there was no error in the motion court's determination that Petitioner's counsel had not provided ineffective assistance regarding the alibi, and "there is evidence that [Petitioner's counsel]'s failure to call [Petitioner's] Mother and Sister as witnesses was a matter of sound trial strategy." (Id.)

The state court's credibility determinations are not "objectively unreasonable based

on the record." **Smulls**, 535 F.3d at 864 (habeas relief may not be granted unless the state court "credibility determinations are objectively unreasonable based on the record")  This Court cannot substitute its judgment as to the credibility of the witnesses for the judgment of the state court which has observed the witnesses' demeanor.  **Marshall v. Lonberger**, 459 U.S. 422, 434 (1983) (a federal habeas court has "no license to redetermine the credibility of witnesses whose demeanor has been observed by the state . . . court"); **Perry v. Kemna**, 356 F.3d 880, 885 (8th Cir. 2004) (quoting Marshall, 459 U.S. at 434).

The record supports the state courts' findings that Petitioner's counsel investigated the alibi defense and determined, as a matter of sound trial strategy, not to present it, including the testimony of Rhonda Ming and Quita Ming.  The state courts' determination that counsel "only failed to call witnesses who would not provide a defense [or] were not credible" is supported by the record, and is not contrary to nor an unreasonable application of federal law as set forth in **Strickland v. Washington**, 466 U.S. 668 (1984).  See **Helmig**, 461 F.3d at 967.

Petitioner has failed to show that trial counsel's investigation of an alibi and trial counsel's decision not to call Rhonda Ming and Quita Ming were deficient or prejudicial. Ground four is without merit.

### Conclusion

Petitioner presents four grounds for relief.  Each was reached by the state courts and found to be without merit.  This conclusion is not contrary to clearly established federal law, is not an unreasonable application of such law, and is not an unreasonable determination of

the facts.  Accordingly,

**IT IS HEREBY ORDERED** that the Attorney General for the State of Missouri, Chris Koster, is added or substituted for Jeremiah W. (Jay) Nixon as a Respondent in this case.

**IT IS FURTHER ORDERED** that Petitioner's requests for an evidentiary hearing are **DENIED**.

**IT IS FINALLY RECOMMENDED** that the 28 U.S.C. § 2254 petition of Ernest Ming be **DENIED** without further proceedings.

The parties are advised that they have **until August 23, 2010,** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

 /s/ Thomas C. Mummert, III

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of August, 2010.